NUMBER 13-98-650-CV 



COURT OF APPEALS 

THIRTEENTH DISTRICT OF TEXAS 

CORPUS CHRISTI 

____________________________________________________________________ 



SYLVIA MUNIZ, Appellant, 



v. 



WAL-MART STORES, INC., 

D/B/A SAM'S CLUB, JAN HOOK, 

JOEL SIMON, GLORIA CARCAMO 

AND CLEO BOTELLO Appellees. 

____________________________________________________________________ 



On appeal from the 148th District Court 

of Nueces County, Texas. 

____________________________________________________________________ 



O P I N I O N 



Before Justices Dorsey, Chavez and Rodriguez 



Opinion by Justice Chavez 





Appellant, Sylvia Muniz, and Yolanda Morris sued Wal-Mart, their former employer, for
libel, slander, and wrongful termination. The final amended petition stated causes of
action for only libel and slander, and was brought by Sylvia Muniz only. The trial court
directed a verdict that Muniz take nothing on both causes of action, and Muniz appeals.
Because we conclude that the investigatory privilege applies to any defamatory statements
at issue in this case, we affirm. 

The events leading up to this lawsuit began on or around April 21, 1993, when employees
at a "Sam's Club" operated by Wal-Mart removed a photograph from a packet that
had been developed for a customer. The photograph showed a nude man. Rumors about the
photograph, and the photograph itself, began to circulate among the Wal-Mart staff. The
evidence is conflicting regarding which employees were involved in circulating the photo,
and the events of Wal-Mart's investigations that followed. 

Muniz testified that she was approached by co-workers Cleo Botello and Patricia
Gonzalez, who brought the photo to her and encouraged her to look at it. Muniz testified
that she refused to take the photo, expressed shock at its contents, and told Botello and
Gonzalez to put it away. Muniz reported this incident to her supervisor, Gloria Carcamo,
but Carcamo laughed and said she already knew about it. 

Muniz testified that she was still concerned that something should be done to stop the
circulation of the photo, but was unsure to whom she could report the matter. Joel Simon,
the store manager, was out of town. According to Muniz, the other store managers were all
part of a clique that included Gloria Carcamo. Muniz was not a part of this clique. On
April 26 Muniz arranged for a family member to call Wal-Mart's "Loss Prevention
Hotline" to report that the photo had been removed from the customer's packet and was
being passed around. On April 28 an investigation began at the store wherein several
employees, including Muniz, were brought into a room to be interviewed by Dalton Sapp, an
assistant manager, and Gloria Carcamo. Cleo Botello was also present. Muniz telephoned Bob
Jones of Wal-Mart's "Loss Prevention" department to report that the
investigation was being conducted by those who were themselves culpable, Carcamo and
Botello. The next day Jones called the store. Muniz testified that Carcamo behaved in a
threatening manner toward her after the call from Jones. On May 3 Jones came to the store
and informed Muniz that he had fired Morris and Botello. Jones considered the
investigation of the incident concluded. At this point in time, no one had given a
statement, orally or in writing, that accused Muniz of wrongdoing. Muniz told Jones that
Patricia Gonzalez had also promoted the viewing of the photograph in the same manner as
Botello. 

Muniz testified that on May 4 she told manager Joel Simon about Gonzalez's involvement,
and also told Simon that Carcamo had known about it and had threatened her for reporting
the incident. Simon continued to investigate this incident, interviewing and obtaining
written statements from several Wal-Mart employees that implicated Muniz. At the
conclusion of this investigation, on May 10, Simon called Muniz into a meeting and
informed her that she was being fired. Present at this meeting were Simon and two other
Wal-Mart employees, Jan Hook and Diana Smith. Hook was Wal-Mart's
regional director and Simon's immediate supervisor. Smith's status, and the reason for her
presence at the meeting, is disputed by the parties. Statements regarding Muniz's
involvement in this incident were discussed at this meeting and later forwarded to Alan
Cafee, Wal-Mart's regional personnel director, who worked out of Wal-Mart's headquarters
in Arkansas. 

During his investigation, Simon obtained several written statements from employees
implicating Muniz as the person who had promoted the viewing of the photo. Muniz contends
that these written statements, as well as similar oral statements made during Wal-Mart's
investigations, were false and defamatory. She further contends that Wal-Mart management
knew the statements were false. 

A directed verdict is appropriate when reasonable minds can draw only one 

conclusion from the evidence. Where the plaintiff fails to present evidence in support
of a fact essential to her right to recover or where a defense against the plaintiff's
cause of action is conclusively proved or admitted, a directed verdict for the defendant
is proper. Villegas v. Griffin Indus., 975 S.W.2d 745, 748 (Tex. App.--Corpus
Christi 1998, pet. denied). On appeal, we examine the evidence in the light most
favorable to the party against whom the verdict was rendered and disregard all contrary
evidence and inferences. Qantel Bus. Sys. v. Custom Controls, 761 S.W.2d 302, 303
(Tex. 1988). When reasonable minds may differ as to the truth of controlling facts, the
issue must go to the jury. Villegas, 975 S.W.2d at 749. 

Libel is a defamation expressed in written or other graphic form that tends to blacken
the memory of the dead or that tends to injure a living person's reputation and thereby
expose the person to public hatred, contempt, ridicule, or financial injury; or to impeach
any person's honesty, integrity, virtue, or reputation, or to publish the natural defects
of anyone and thereby expose the person to public hatred, ridicule, or financial injury.
Tex. Civ. Prac. & Rem. Code Ann. 73.001 (1997); Cain v. Hearst Corp. 878
S.W.2d 577, 580 (Tex. 1994). Slander, the spoken form of defamation, is not codified by
statute, but has been recognized at common law to be "a defamatory statement orally
published to a third party without justification or excuse." Randall's Food
Markets, Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995). 

An employer has a conditional or qualified privilege that attaches to communications
made in the course of an investigation following a report of employee wrongdoing. Id.
The privilege applies only as long as communications pass only to persons having an
interest or duty in the matter to which the communications relate. Id. However,
proof that a statement was motivated by actual malice existing at the time of publication
defeats the privilege. Id. In the defamation context, a statement is made with
actual malice when the statement is made with knowledge of its falsity, or with reckless
disregard for the truth. Id. Negligence, failure to investigate the truth or
falsity of the statements prior to publication, and failure to act as a reasonable prudent
person are insufficient to support a finding of malice. East Texas Medical Center
Cancer Institute v. Anderson, 991 S.W.2d 55, 60 (Tex. App.--Tyler 1998, no pet.); Schauer
v. Memorial Care Systems, 856 S.W.2d 437, 450 (Tex. App.--Hous. [1st Dist.] 1993, no
writ); Shearson Lehman Hutton, Inc. v. Tucker, 806 S.W.2d 914, 921-22 (Tex.
App.--Corpus Christi 1991, writ dism'd w.o.j.); but see Campbell v. Salazar,
960 S.W.2d 719, 728 (Tex. App.--El Paso 1997, writ denied)(failure to investigate before
accusing plaintiff contributed to malice showing). 

Wal-Mart contends that this investigatory privilege immunizes it from liability in this
case. Muniz contends that publication of defamatory statements to Diana Smith and Alan
Caffee were outside the privilege. We hold that both Smith and Cafee had an interest or
duty in the matter to which the communication relates, and that there is no evidence of
malice to defeat the privilege. 

Muniz contends that there is no evidence in the record that Caffee had a duty to
investigate in this case. However, this argument covers only the "duty" half of
the test for the application of the investigatory privilege, and does not address the
evidence that Caffee had an "interest" in the investigation. There may be many
individuals within an organization who rightfully take part in an investigation. It is
conceivable that many people, while they may not have a "duty" to investigate in
all circumstances, would have a rightful "interest" in participating. For
example, at a store with several assistant managers, investigating employee misconduct may
be a task that is shared among them, so that each participates in some, but not all,
investigations. Caffee was Regional Personnel Director for Wal-Mart. The statements taken
in this investigation were only forwarded to him after a lawsuit was filed. It is
reasonable that a personnel executive would have an interest in a lawsuit arising from
personnel decisions. We hold that the investigatory privilege extended to Alan Caffee. 

With regard to Diana Smith, Muniz relies on testimony from Joel Simon that Smith
"had no obligation," and "didn't do anything" at the meeting where she
was privy to the allegedly defamatory statements. However, Joel Simon testified that Smith
was "in charge of personnel" and was present to serve as a female witness(1) to the events of Muniz's termination. Muniz identified
Smith as "just someone who works in the cash office" with no supervisory role.
However, even if we consider Muniz's testimony to have raised a fact issue regarding
Smith's job duties, Muniz failed to controvert Simon's testimony that Smith was present to
serve as a female witness. Although Muniz points to Simon's testimony that Smith had no
obligation to perform at the meeting and "didn't do anything," her presence as a
witness, presumably as a protection against claims of sexual harassment, did provide a
legitimate justification for her presence. We conclude that the investigatory privilege
also extended to Diana Smith. 

Finally, we consider whether there is evidence that Wal-Mart acted with actual malice
by publishing defamatory statements with knowledge of their falsity, or with reckless
disregard for the truth. The allegedly defamatory statements consist of several written
statements from Muniz's co-workers implicating her in promoting the viewing of the photo,
and a written statement from Joel Simon to Alan Caffee discussing the results of Simon's
investigation. 

Muniz contends that there is some evidence that Wal-Mart exhibited reckless disregard
for the truth of the co-workers' statements, which Muniz testified were untrue. Muniz
argues that many of the people whose statements implicated her were close friends with
Carcamo, and that Simon should have been suspicious about the fact that some of the
statements were not dated. Muniz also argues that it is reasonable to infer that Simon
would want to retaliate against Muniz for reporting wrongdoing at Simon's store to Bob
Jones. Muniz also contends that Simon should have doubted the veracity of the statements
because of the unlikelihood that a person who reports misconduct will turn out to be the
one guilty of the misconduct. 

There is no evidence that Simon knew that many of those who wrote statements
implicating Muniz were members of a clique which excluded Muniz. Simon admitted only that
he knew Cleo Botello and Gloria Carcamo were "good friends,"
but insisted that he did not know they were "bosom buddies." There is no
evidence that Simon knew of a wider clique beyond the friendship of Botello and Carcamo.
Simon also added that he considered Botello's statement implicating Muniz particularly
credible, because it was written after Botello had already lost her job, and because
Botello's statement implicated not only Muniz but also Botello's good friend Carcamo. 

Muniz also refers to Simon's testimony that it would be "surprising" for a
person who reported misconduct to be involved in the misconduct. However, Muniz
misconstrues Simon's meaning. In his report to Caffee, Simon first detailed Muniz's
involvement with promoting the viewing of the photo, and then discussed "secondary
issues concerning Sylvia." Among these "secondary issues" was "Number
One: Questionable phone calls. The original call that brought this incident to attention
comes from a male associate who turns out to be Sylvia's husband." When asked
"What's questionable about that?" Simon answered ". . . it would be the
natural inclination that if someone called to report this thing and then they ended up
being involved with it was somewhat at question [sic], I think so. And it's
surprising." He further explained "I think it just raises a signal that if
someone does blow the whistle or does something that we consider very good and then it
ends up being that they are involved with it, that is something that we would be concerned
about." 

Muniz argues that Simon's "surprise" and "concern" indicate that
even he doubted whether Muniz was really guilty. However, it is apparent that Simon's real
"concern" was that Muniz might be guilty not only of encouraging co-workers to
see the customer's photo, but also of fabricating allegations of misconduct against
someone else. We see no evidence of malice in Simon's response to the fact that Muniz
reported the misconduct for which she herself was later determined to be responsible. 

Muniz also argues that, because Simon would have been embarrassed by Muniz's reports of
wrongdoing in the store, a jury could infer that Simon was motivated to retaliate against
her. However, evidence of a possible motive, by itself, is not evidence of wrongdoing.
There is no evidence that Simon knew the statements being given to him were false. Rather,
Simon testified that, as he gathered information from a variety of sources, he found from
looking "at the overall deal" and "how the whole thing goes together"
that Muniz's accusations were unsubstantiated, and that the evidence instead pointed back
at her. 



Muniz also contends that a report Simon wrote and submitted to Alan Caffee was
libelous. Muniz contends that the report contained several statement that were defamatory,
and several which Simon knew to be false. As evidence that the statements were false,
Muniz relies on her own testimony about contact she had with Simon, and on her claims that
the statements of her co-workers were false. As discussed above, there is no evidence that
Simon knew any of the co-workers' statements were false. In her own testimony, Muniz
personally contradicted parts of Simon's statement wherein Simon describes contact and
conversations with Muniz in a manner that Muniz testified was untrue. However, none of
those portions of Simon's statement were defamatory. 

Muniz testified that the following statements in Simon's report regarding Simon's
contact with Muniz were untrue: 

(1) "On May the 3rd Bob Jones and I talked with Sylvia." Muniz testified that
Simon never talked to her, and that Bob Jones was not present at the store that day. 

(2) "On May the 4th Sylvia used the open-door policy to ask why Gloria, her
supervisor, had not been fired." Muniz testified that she never asked why Gloria
Carcamo had not been fired. 

(3) "Sylvia stated that she had seen Gloria take the pictures home and that Ray
Rodriguez could verify this." Muniz testified that she did not tell Simon she had
seen Gloria take the pictures home. 

(4) "Sylvia also states that Pat, a fellow associated at membership, had shown the
photo to Mercy. When I asked her why she did not tell us the day before, she said she
thought they would be fired anyway." Muniz denied making these statements. 

(5) "Ray Rodriguez lives with Gloria's daughter. Their dislike for each other was
well known by Sylvia." Muniz denied telling Simon about animosity between Rodriguez
and Gloria Carcamo. 

None of the statements disputed by Muniz were defamatory to Muniz. Therefore, they
cannot form the basis of a cause of action for libel, even if there is some evidence that
Simon made these statements with knowledge of their falsity. 

We conclude that the trial court acted properly in directing a verdict in favor of
Wal-Mart on all of appellant's causes of action. The judgment of the trial court is
affirmed. 

MELCHOR CHAVEZ 

Justice 



Do not publish. 

TEX. R. APP. P. 47.3. 



Opinion delivered and filed this 

the 31st day of March, 2000. 

1. Simon testified that it was Wal-Mart policy that a female always
be present as a witness when a male manager fired a female employee. Muniz testified that,
in eight years of working at Wal-Mart, she had never heard of this policy. For purposes of
reviewing the directed verdict in favor of Wal-Mart, we assume that there was no such
policy, and that the decision that Smith should be present was Simon's own. See Qantal,
761 S.W.2d at 303.